FREDERICK SEYBEL, Appellant, v. THE NATIONAL CURRENCY BANK, Respondent.

One who purchases negotiable paper before due for a valuable consideration, in good faith and without actual knowledge or notice of any defect of title, holds it by a title valid as against every other person.

Suspicion of a defect of title; knowledge of circumstances which would excite such suspicion in the mind of a prudent man; disregard of means of information, an examination of which would disclose such defect; in fine, gross negligence at the time of the purchase, will not alone defeat his title. It is evidence, but not conclusive, of bad faith, and that must be established by one seeking to impeach such title.

A dealer in United States bonds, payable to bearer, is not bound to make inquiry of one offering to sell as to his right or title thereto, or to take any special precautionary measures to ascertain or protect the interests of others; and in case of the purchase by him of such bonds which have been stolen, the fact of an omission on his part to examine and regard notices of the theft left at his place of business, will not, of itself, without actual knowledge or notice, deprive him of the character of a *bona fide* purchaser. (REYNOLDS and GRAY, CC., dissenting.)

Defendant purchased, in the ordinary course of its business, two United States bonds, payable to bearer, paying therefor full market value. The bonds had been stolen from the plaintiff the evening previous, and printed notices of the theft, describing these bonds, with others, had been left at defendant's office, upon its cashier's desk, on the morning of the purchase. In an action to recover the value of the bonds, plaintiff testified that at the time he made demand of the bonds of defendant's cashier, he notified him of the sending of the notice, and that the cashier replied that they did not care for notice; defendant thereupon called the cashier and after he had testified that he did not see the notice, to his knowledge, offered to prove by him, in substance, that bonds of the kind stolen were received and paid out by defendant and by bankers and brokers generally as money; that the amount of them and the amount stolen was so great, and the notices of theft and loss so frequent, that it was impossible for defendant, without stopping its business, to regard the notices and compare the securities offered for sale therewith. This evidence was objected to by plaintiff and rejected. *Held* (REYNOLDS and GRAY, CC., dissenting), error; that disregard of and omission to examine the notice alone would not defeat defendant's title or deprive it of the protection extended to a *bona fide* purchaser, but that the tendency of plaintiff's evidence was to impress the jury that defendant was not such a purchaser; and the purport of the proof offered was to remove such impression and to repel any imputation of bad faith, and so the evidence was proper.

The authorities bearing upon the rights of *bona fide* purchasers, collated and discussed. *Pringle* v. *Phillips* (5 Sand., 157), limited.

(Argued January 17, 1873; decided June term, 1873.)

APPEAL from order of the General Term of the Court of Common Pleas for the city and county of New York, reversing a judgment in favor of plaintiff entered on a verdict, and granting a new trial.

This action was brought to recover the value of two United States bonds, for $1,000 each, payable in 1881, which had been stolen from the plaintiff and purchased by the defendant. They were stolen on the evening of September 12, 1865, and bought by the defendant, in the regular course of its business, on the next day.

The facts, so far as they are material, are sufficiently stated in the opinions.

*Walter S. Poor* for the appellant. The motion to dismiss the complaint at the end of plaintiff's case was properly denied. (*Goodman* v. *Simonds*, 20 How. [U. S.], 345; *Bernhardt* v. *R. and S. R. R. Co.*, 23 How., 166; *Byrd* v. *Hall*, 2 Keyes, 646; *Johnson* v. *Monell*, id., 655; *May* v. *Chapman*, 16 M. & W., 355; *Ernst* v. *H. R. R. R. Co.*, 35 N. Y., 39, 40; *Topping* v. *Lynch*, 2 Rob., 484.) Plaintiff having shown that a fraud had been committed upon him, of which defendant had notice, this was enough to compel it to show how it obtained the securities. (*Case* v. *Mechanics' Bk'g Ass'n*, 4 N. Y., 168; *Cardwell* v. *Hicks*, 37 Barb., 458; *Catlin* v. *Hansen*, 1 Duer, 309; *Ross* v. *Bedell*, 5 id., 462; *Monroe* v. *Cooper*, 5 Pick., 412; *White* v. *Springfield Bk.*, 1 Barb., 225; *Vallett* v. *Parker*, 6 Wend., 615; *Smith* v. *Braine*, 3 E. L. & E., 379; *Bailey* v. *Bidwell*, 13 M. & W., 73.) If defendant had notice of the theft, plaintiff is entitled to a verdict. (*Mayer* v. *Badger*, 34 N. Y., 249; *Belmont B. Bk.* v. *Hoge*, 35 id., 65; *Welch* v. *Sage*, 47 id., 143; *Down* v. *Halling*, 4 Carr. & P., 330.) If an exception is taken to a charge embracing two separate propositions, one of which is

good, the whole exception falls. (*Haggart* v. *Morgan*, 5 N. Y., 422; *Jones* v. *Osgood*, 6 id., 233 ; *Hart* v. *R. and S. R. R. Co.*, 8 id., 37; *Hodges* v. *Cooper*, 45 id., 216.) If, with reasonable care. and attention, defendant might have had notice of the loss, plaintiff was entitled to recover. (*Bernhardt* v. *R. and S. R. R. Co.*, 23 How., 166; *Keller* v. *N. Y. C. R. R. Co.*, 26 id., 177; *Ireland* v. *Oswego R. R. Co.*, 3 Kern., 533 ; *Brown* v. *Lyne*, 31 Penn. St., 512; *Cayzer* v. *Taylor*, 10 Gray, 280 ; *McGraw* v. *Stone*, 13 Penn., 442 ; 2 Kent's Com., 560.) Where a purchaser receives notice of circumstances that would excite suspicion, a want of caution and diligence, such as an honest man would exercise, is want of good faith. (*Newell* v. *Doty*, 33 N. Y., 83 ; *Baker* v. *Bliss*, 39 id., 70 ; 2 Kent's Com., 560 ; *Hall* v. *Hinds*, 2 M. & G., 847.) If the notice reached defendant and it chose to disregard it, it is not a purchaser in good faith. (*Whitbread* v. *Jordan*, 1 You. & Col., 303 ; *May* v. *Chapman*, 16 Mee. & W., 355 ; *Goodman* v. *Simonds*, 20 How. [U. S.], 343 ; *Williamson* v. *Brown*, 15 N. Y., 354; *Devlin* v. *Brady*, 36 id., 531 ; *Newell* v. *Doty*, 33 id., 83 ; *Jackson* v. *Post*, 9 Cow., 120 ; *Wiggin* v. *Bush*, 12 J. R., 306 ; *Comstock* v. *Hoag*, 5 Wend., 600 ; *Small* v. *Smith*, 1 Den., 583 ; *Johnson* v. *Bloodgood*, Caine's Cas., 302 ; *Clark Nat. Bk.* v. *Bk. of Albion*, 52 Barb., 592 ; *Newell* v. *Gregg*, 51 id., 263 ; *Owen* v. *Homan*, 4 H. L., 997, 1035 ; *Jones* v. *Williams*, 24 Beav., 47.) Where there is any evidence, the finding, the verdict of a jury or the decision of a single judge, as to matter of fact, is conclusive. (*McGrath* v. *H. R. R. R. Co.*, 19 How., 211 ; *Burnham* v. *Butler*, 31 N. Y., 480; *Moak* v. *Foland*, 3 How., 84; *Mendell* v. *French*, 2 Hilt., 178.)

*Amasa J. Parker* for the respondent. Even gross negligence will not defeat the title of a *bona fide* purchaser. (*Magee* v. *Badger*, 34 N. Y., 247; *Belmont* v. *Hoge*, 35 id., 67 ; *Birdsall* v. *Bussell*, 29 id., 249; *Goodman* v. *Simons*, 20 How. [U. S.], 365; *Lardner* v. *Murray*, 3 Wall., 121; *Hale* v. *Wilson*, 16 Barb., 548; *Welch* v. *Sage*, 47 N. Y., 143; *Back-*

*house* v. *Harrison*, 3 B. & A., 1098; *Steinhart* v. *Baker*, 34 N. Y., 347.)

LOTT, Ch. C.   A new trial was properly granted in this case, on the ground of the improper exclusion of evidence offered on the part of the defendant.   It is stated in the respondent's points that the bonds in question were payable to bearer.   I do not find that fact proven, but it appears to have been assumed on the trial that they were such, or at least transferable by delivery.   They must, therefore, be deemed to have been of that description.   The plaintiff proved a demand of them from the defendant on or about the 23d day of September, 1865, being eleven days after they were stolen, and its refusal to deliver them.   The demand was made of the cashier, and he answered, according to the plaintiff's statement, "You can't have them."   To which the plaintiff replied (as he states) as follows : " Then I said, why ? I sent you a printed notice of the robbery the next morning," adding, " He said they did not care for the notice.   We don't care for notice.   That was the answer.   He said, if you wait a little while you can see Mr. Thompson, and I waited." The plaintiff then, without any previous explanation given by the defendant of the circumstances under which he obtained possession of them, and before any proof whatever was given by it—introduced evidence tending to show that two printed notices of the robbery, containing the numbers of the bonds in question, and of fifteen more were left before nine o'clock in the morning after it occurred, in the banking-house of the defendant—one on a desk marked " cashier's desk," and the other on the desk opposite—while persons were sweeping the office, in such a position as to be noticed by the occupants of the desks when they came in and took their places. The bonds in question were designated therein as follows : bond 37,864, $1,000, 1881; bond 37,865, $1,000, 1881; after a statement that seventeen United States bonds had been stolen, numbered and described as mentioned in the notice. After this testimony had been introduced, the plaintiff

rested, and the defendant's cashier was examined on its behalf, and after giving a description of the locality of his desk, and stating facts tending to prove that the desk, described by one of the plaintiff's witnesses as his, was not so in fact; stated that he did not see the notice referred to, to his knowledge, and gave other testimony tending to show the purchase of and payment for the bonds by the defendant (which was dealing daily in government securities of all kinds, and in all kinds of bonds), in its usual course of business, and the price paid for them, which was subsequently shown to be their full market value. He also testified that there were three kinds of bonds of 1881, and that there were two sets of bonds payable in 1881 of the numbers of those in controversy, and that he had been in the banking business a number of years.

The defendant's counsel then offered to prove, by this witness, the following facts:

"1st. That these government securities are payable to bearer. That the amount in circulation is so great, and the amount stolen and lost is so great, and the notices of such thefts and losses so frequent that it is utterly impossible, without stopping their business, for the defendant to take notice of and keep track of those lost and stolen.

"2d. That the defendant dealt largely in government bonds similar to these, and that they are received and paid out as money by defendant, and by bankers and brokers generally; that very large amounts, amounting to several millions, had been stolen and advertised; that notices are being thrown in constantly in their bank of such thefts, with lists, numbers and descriptions, and that it would be impracticable to deal in government securities if they are bound to take notice of such notices.

"3d. That U. S. securities like those in suit pass from hand to hand by delivery, are received and paid out by banks, bankers and brokers as money, are bought and sold daily in the market, in parcels varying from $1,000 to $500,000, and that they are always paid for in cash on delivery.

"4th. As a separate proposition, in connection with the

last above proposition, that printed notices of loss of such and other securities, by theft and otherwise, are daily, and frequently each day, thrown or brought into the offices of dealers in such securities, and that it is impracticable, in the ordinary course of such business, to make a comparison between such notices and the securities purchased and delivered.

"5th. The defendant's counsel then made the same offers numbered herein 3d and 4th, confining the same to defendant's bank, and not to dealers, banks and bankers generally."

Each proposition was offered separately in the order above set forth, and was excluded on a general objection to each of them, without specifying any ground therefor, and a separate exception to each ruling was taken by the defendant's counsel.

The cashier then stated, in reference to the interview between the plaintiff and himself, spoken of by the plaintiff, that what he told him was that it would be impossible for them to pay attention to all notices, and on being asked by the defendant's counsel whether he said that he could not pay any attention to notices, he answered that he " did say something like that; " and in answer to a question by the plaintiff's counsel, whether that statement was in fact true, he made the following answer: "It was true; we buy and sell bonds without any regard to these notices left in the office; we look at notices from time to time, but we keep no record of them; no instructions are given by me to the clerks or officers to bring the notices to me personally."  He stated further that he was in the office at nine o'clock of the morning of the thirteenth of September, but could not tell whether any one else was.

It is apparent, from the preceding statement of what had been proved by the plaintiff when the testimony offered on behalf of the defendant was excluded, that his object and its tenor was to show that the defendant's cashier, by saying "We don't care for notice," willfully disregarded all notices, that were left at its office or place of business, of thefts or rob-

beries of such bonds as were stolen from him. Its tendency and its probable effect was to impress the jury with the belief that the defendant was not a purchaser in good faith, but was, on the contrary, chargeable with bad motives and actual fraud. It afforded sufficient ground for the plaintiff's counsel to argue to them, as he has urged in his points on the argument before us, that "if from this the jury could not infer fraud, it would be difficult to infer it in any case. As well might the defendants put up a sign, ' stolen goods received here, and no questions asked.' " Such an appeal made by eloquent counsel, having the opportunity of closing the summing up, on such facts could not well fail to secure from the jury a verdict against the defendant, proved to be " a regular national bank," in favor of the plaintiff, who had informed them that he carried on " a fancy store" at 111 Eighth avenue, and resided " in the *upper* part," and that he had lived there fourteen years.

The general purport of the proof offered and rejected was to repel and remove all and every ground for the imputation of bad faith to the defendant, by showing that it was impracticable, and indeed impossible for it, in the prosecution of its business, to regard notices left at its banking-house or office, as those in question were stated to have been. Its exclusion appears to have been placed on the ground that the mere omission of the cashier to read, or become informed of, the contents of such notices, if he saw them, or might have seen them, but for the defendant's disregard of them, as testified to by him, charged it with such want of due and reasonable care, caution and prudence, and such gross negligence in making its purchase, as to deprive it of the protection extended to a *bona fide* purchaser. This is inferable from the general scope and tenor of the judge's charge to the jury, although he did not assign that reason at the time he excluded the evidence. His ruling was in accordance with the rule of law, as declared by the King's Bench, in *Gill* v. *Cubitt* (3 Barnewall & Cresswell, 466, decided in 1824), and subsequently modified by the decision in *Crook* v. *Jadis* (5 Barnewall & Adol-

phus, 909, made in 1834). See also *Backhouse* v. *Harrison* (ib., 1098). The rule was, however, repudiated in *Goodman* v. *Harvey* (4 Adolphus & Ellis, 870, decided in 1836). That was an action against the drawers of a bill by an indorsee for value, whose title was disputed on the ground that his indorser, who had paid no value for it, obtained its discount in fraud of the right owner. It appeared that the drawees refused acceptance of the bill, and that the notarial marks of non-acceptance were noted thereon. It was objected, as one ground of defence, that the plaintiff, in taking the bill with such marks on it, had been guilty of gross negligence, and therefore took it with all its vices, and could have no better right to recover thereon than his indorser. Lord Chief Justice DENMAN is stated, in the report of the case, to have been of this opinion, and to have observed "that the plaintiff had received the bill with a death wound apparent on it, and he proposed to the plaintiff's counsel either a nonsuit or that the cause should go to the jury on the question whether or not the plaintiff had been guilty of gross negligence. The jury, in answer to the question from the lord chief justice, said that, in their opinion, the notary's marks on the bill were sufficient notice to an indorsee of non-acceptance." A nonsuit was then taken, and at the next term of the court a motion for a new trial was made on the ground that the above ruling against the plaintiff was incorrect; that the bill had been lawfully sent into the market by the payee, while not yet due, and that the plaintiff, who had taken it before maturity and given value for it, had a right to recover the amount, notwithstanding the defect in the title of an intermediate party. A rule *nisi* was granted; and subsequently, on hearing counsel on the part of the defendant against it, the plaintiff's counsel, after some discussion in support of it, and after stating that the only question was whether the plaintiff acted *bona fide* in discounting the bill, was stopped by the court, and Lord DENMAN, C. J., said: " The question I offered to submit to the jury was, whether the plaintiff had been guilty of gross negligence or not. I believe we are all of opinion

that gross negligence only would not be a sufficient answer, where the party has given consideration for the bill. Gross negligence may be evidence of *mala fides*, but is not the same thing. We have shaken off the last remnant of a contrary doctrine. Where the bill has passed to the plaintiff, without proof of bad faith in him, there is no objection to his title. The evidence in this case, as to the notarial marks, could only weigh, as rendering it less likely that the bill should have been taken in perfect good faith." LITTLEDALE, PATTERSON and COLERIDGE, JJ.; concurred, and the rule was thereupon made absolute.

The doctrine there laid down was reaffirmed by the same court, in *Uther* v. *Rich* (10 Adol. & Ell., 784, decided in 1839); *Arbouin* v. *Anderson* (1 Q. B., 498–504, decided in 1841), and is now understood to be undisputed in England. See Byles on Bills of Exchange (119); he says: "It is now definitively settled that if a man takes, *honestly*, an instrument made or become payable to bearer, he has a good title to it, with whatever degree of negligence he may have acted, unless his gross negligence induce the jury to find *fraud.*" And he also says that "Exchequer bills, which are payable to bearer before the blank is filled up, bonds of foreign princes and States, payable to bearer and East India bonds resemble money and bills of exchange payable to bearer, in the necessary union of possession and property. Honest acquisition confers title."

Chancellor KENT, in his Commentaries (vol. 3, p. 82), seems to have considered the rule to be, that in any case in which the indorsee takes paper under circumstances which might reasonably put the holder upon inquiry and create suspicions that it was not good, he takes at his peril; and he refers to the case of *Gill* v. *Cubitt* (*supra*) as establishing that principle, and as overruling the doctrine of Lord KENYON, in *Lawson* v. *Weston and ors.* (4 Esp. N. P., 56), in which he, in answer to a claim on behalf of the defendants that "a banker or any other person should not discount a bill for one unknown, without using *due diligence* to inquire into the cir-

cumstances," replied that " if there was any fraud in the trans-action or if a *bona fide* consideration had not been paid by the plaintiffs to be sure they could not recover; but to adopt the principle of the defence to the full extent stated, would be to paralyze the circulation of all the paper in the country, and with it all its commerce," but added, " that the circum-stance of the bill having been lost, might have been material if they could bring knowledge of that fact home to the plaintiffs. The plaintiffs might or might not have seen the advertise-ment, and it would be going a great length to say that a banker was bound to make inquiry concerning every bill brought to him to discount."

The doctrine as laid down in *Goodman* v. *Harvey* (*supra*) was considered by the Supreme Court of this State, in *Hall* v. *Wilson* (16 Barb., 548), and it was said by W. F. Allen, J., giving the opinion of the court, in July, 1853, that it had been adopted and approved by the courts of some of the States of the Union, and that he had met with no case in our own courts in conflict with it, and added, " So that, in the absence of evidence of bad faith in the holder, if he is, in other respects, within the rule established for the benefit of commercial paper, his title will be upheld."

It appears to have been disapproved by the Superior Court of the city of New York in *Pringle* v. *Phillips* (5 Sand. R., 157, decided in June 1851), but as that was an action of replevin in the *detinet*, for the recovery of *merchandise* which had come into the possession of the defendant from a fraudu-lent vendee of the plaintiff, as security for advances made, but, as alleged by the plaintiff, with notice of the fraud, the question now under consideration was not involved therein.

The subject came before the Supreme Court of the United States in 1857, on a writ of error from the Circuit Court for the District of Missouri, in *Goodman* v. *Simonds* (20 How. U. S. Rep., 343). That was an action against an acceptor of a bill of exchange placed in the hands of the plaintiff by the drawer as collateral security for his own debt, and in which the cir-cuit judge instructed the jury that if such facts and circum-

stances were known to the plaintiff as caused him to suspect, or that would have caused one of ordinary prudence to suspect, that the drawer had no interest in the bill and no authority to use the same for his own benefit, and by ordinary diligence he could have ascertained the facts, then they would find in favor of the defendant.    That instruction was held to be erroneous.    Justice CLIFFORD, in giving the opinion of the court said, there was no doubt that the Circuit Court, in giving that instruction, intended to apply the doctrine to the case that the title of the holder of a negotiable bill of exchange, acquired before maturity, is not protected against prior equities of the antecedent parties to the bill, where it was taken without inquiry and under circumstances which ought to have excited the suspicions of a prudent and reasonable man ; and after stating that a well-defined and correct exposition of the rights of a *bona fide* holder of a negotiable instrument was given by that court in *Swift* v. *Tyson* (16 Pet., 1), in 1842; and that such exposition was adopted by it relative to the point then under consideration " as one accurately defining the nature and character of the title to those instruments, which such holder acquires when they are transferred to him for a valuable consideration," added, " This court then said and we now repeat, that a *bona fide* holder of a negotiable instrument for a valuable consideration, without notice of facts which impeach its validity between the antecedent parties, if he takes it under an indorsement made before the same becomes due, holds the title unaffected by these facts, and may recover thereon, although, as between the antecedent parties, the transaction may be without any legal validity."    He then proceeded to consider the question on principle and as affected by authority ; and after a very able discussion of the question and an elaborate and discriminating examination of the decisions bearing on it, he approves of the rule laid down in *Goodman* v. *Harvey* (*supra*), which, he said had since that decision, undoubtedly been the settled law in all the English courts.    He then added that, according to that rule, applied to the case then under

review, "proof that the plaintiff had been guilty of gross negligence in acquiring the bill, ought not to defeat his right to recover, and if not, it serves to exemplify the magnitude of the error assumed in the instruction, that any facts and circumstances which would excite the suspicion of a careful and prudent man were sufficient to destroy the title." * * "Gross negligence is defined to consist of the omission of that care which even inattentive and thoughtless men never fail to take of their own property; and if such neglect would not defeat the right to recover—and clearly it would not, unless attended by bad faith—it cannot require any further reasoning to demonstrate that the instruction was erroneous." He then said that, "the law has been uniform since the decision in *Goodman* v. *Harvey*, which was decided in 1836; and we think it will appear upon an examination, that it has always been the same—at least from a very early period in the history of English jurisprudence down to the present time, except for an interval of about twelve years, while the doctrine prevailed which is now invoked in support of the instruction in this case; that doctrine had its origin in *Gill* v. *Cubitt* (3 Barn. & Cress, 466)." He then remarked that, "A brief reference to some of the earlier cases will be sufficient to show that the decision in *Gill* v. *Cubitt* was a departure from the well known and long established rule upon the subject under consideration;" and after citing *Hinton's Case* (reported in 2 Show., 247); *Anonymous* (1 Selk., 126); *Miller* v. *Race* (1 Burr, 462); *Grant* v. *Vaughan* (3 Burr, 1516); *Peacock* v. *Rhodes* (2 Doug., 633), and lastly *Lawson* v. *Weston & ors.* (4 Esp. R., 56), before referred to, he concluded with the remark that, "The cases cited, commencing in 1694 and ending in 1801, are sufficient to show what the state of the law was in 1824, when *Gill* v. *Cubitt* was decided—especially as the judges of the King's Bench, in giving their opinions on that occasion, did not pretend that there were any later decisions in which it had been modified."

- The rule or doctrine adopted in *Smith* v. *Tyson* and *Goodman* v. *Simonds* (*supra*), was recognized, approved and reaf-

firmed in the case of *The Bank of Pittsburgh* v. *Neal & ors.* (22 How., at p. 108), and was subsequently applied (in 1864) in *Murray* v. *Lardner* (2 Wallace U. S. Rep., 110), to a purchase of coupon bonds of the Camden and Amboy Railroad Company, payable to bearer. They were stolen from Lardner, who resided near to and transacted business in Philadelphia, on the night of Wednesday the 23d of February, 1859, but, the theft was not discovered till Saturday, the 26th. Notices of the robbery appeared in the Philadelphia Ledger (the newspaper in Philadelphia having the largest circulation there) and in leading New York papers, on Monday, the 28th. In the meantime, and on the morning after the theft, they were negotiated to Murray, a broker of character, engaged in the negotiation of such bonds, at his office in Wall street, in the city of New York for full value. They were taken by him on hypothecation for a loan to a man calling himself Dr. A. D. Bates, of Milford, Sussex county, New Jersey, from whom a stock note for its payment was given. The borrower was a stranger to Murray, and was introduced to him by a Mr. Parker, another broker of good character, to whom he applied for the loan. After such introduction, Murray asked him of whom he got the bonds and also made some inquiries of him as to his acquaintance with persons in the city of New York; he replied that he obtained the bonds of Mr. Lardner of Philadelphia, and named some persons with whom he said he was acquainted, and also stated for what purpose the money was wanted, and thereupon the loan was made. Parker testified that the borrower was a stranger to him and that he so told Murray; but Murray stated, on his examination, that he had no remembrance that Parker made such statement, and he thought if it had been, his suspicion would have been awakened. He also said that it was always his custom to know from whom securities come before dealing, and that it was the custom of brokers generally, but he added that he did not think it necessary to inquire about Bates, he being introduced by Parker. The action was one of detinue, brought in the Circuit Court for the

southern district of New York; and, on the facts above disclosed, the court was asked by the defendant's counsel to charge the jury "that there were no such suspicious circumstances attending the transaction between Bates and Murray as to put Murray on inquiry; and that Murray was not chargeable with bad faith by any omission on his part to inform himself in regard to the bonds and Bates' title to them, further than he did." The court refused so to charge, but did charge them that it was for them to say " whether the defendant had made out that he received the paper in good faith, without any notice of the defect of the title; in other words, of the theft from the plaintiff; or whether there were such circumstances as would warrant the inference that there was ground of suspicion, and that he should have made further inquiry as to the character of the paper." This instruction was excepted to; and the jury having found a verdict for the plaintiff, its correctness was the question brought before the Supreme Court on a writ of error to the Circuit Court. It was very fully discussed and considered by Justice SWAYNE; and he, in delivering the opinion of the court, after referring to the decision of *Goodman* v. *Harvey,* and saying that it had been followed by that court in *Swift* v. *Tyson,* *Goodman* v. *Simonds,* and again in the *Bank of Pittsburgh* v. *Neal,* above referred to, said: "In *Goodman* v. *Simonds* the subject was elaborately and exhaustively examined, both upon principle and authority. That case affirms the following propositions: The possession of such paper carries the title with it to the holder; " the possession and title are one and inseparable; the party who takes it before due for a valuable consideration, without knowledge of any defect of title and in good faith, holds it by a title valid against all the world. Suspicion of defect of title, or the knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker at the time of the transfer, will not defeat his title. That result can be produced only by bad faith on his part. The burden of proof lies on the person

who assails the right claimed by the party in possession. Such is the settled law of this court, and we feel no disposition to depart from it."

The opinion, after an expression or declaration that the court were well aware of the importance of the principle involved in the inquiry to the commercial world and to the community at large, concludes with this statement: "The instruction under consideration in the case before us is in conflict with the settled adjudications of this court." (See also *Galveston Railroad* v. *Cowdrey*, 11 Wall. [U. S.], 478.)

The decisions of the courts in this State are in harmony with the adjudications of the Supreme Court of the United States. (See *Steinhart* v. *Boker*, 34 Barb., 436; *Magee* v. *Badger*, 34 N. Y., 247; *Belmont Branch Bank* v. *Hoge*, 35 id., 65; *Welch* v. *Sage*, 47 id., 143.)

In the last case it is said by PECKHAM, J., in giving the opinion of the court, that "unless the evidence makes out a case upon which a jury would be authorized to find fraud or bad faith in the purchaser, it is the duty of the court to direct a verdict."

It is clear from the preceding exposition of the law as declared by the decisions of the Supreme Court of the United States, to which I have referred, and which must be deemed to be the settled law, that the defendant was under no obligation to make any inquiry of the person who offered the bonds in question for sale as to his right or title thereto, or to take any special precautionary measures in the purchase of securities by which the interest of other parties should be protected; and if it could be deemed chargeable with want of caution or even negligence in the omission of its cashier or any of its officers to take up and read the notices of the theft that were left on its desks, it was not by reason of such omission alone deprived of the protection of a *bona fide* purchaser. It was necessary for the plaintiff to establish *bad faith*; and if the disregard by the defendant, as stated by its cashier, of notices tended to prove that fact, it was clearly proper to repel the imputation or inference, not only by an explanation of what

was stated, but by proving that such disregard was entirely consistent with fair and honest dealing; and was necessary, or at all events, not improper, from the impracticability of paying attention to them. The object of the proof offered was to show, and the facts stated in the offers tended to prove, that no bad faith or fraud could be properly imputable to the defendant from the omission of its cashier or officers to read the contents of notices left with it. Indeed, the fact that the notice of the theft of the bonds in question contained a statement that fifteen more had been stolen, with a description of them, would seem to justify the conclusion that the numbers and description of them all could not have been borne in mind and remembered; and that to have made any attention to it, useful or available, it would have involved the necessity of having a record kept to which a reference would be necessary whenever a security was offered to it for sale, without any limitation of time. A rule that would require a purchaser to keep such a record and make such examination would, in its practical operation, throw the risk of purchasing bonds or securities that were stolen or lost, or to which the party offering them had no title, on the buyer, in all cases where a notice of the fact had been left at his place of business at any previous time, whether it actually reached him or not. Any proof that it had been so left would cast the burden on him of satisfying a jury that it had not reached him. The general object of the evidence excluded and rejected in this case was to establish that it was impossible for the defendant, without stopping its business, to regard such notices. If the facts offered to be shown by the first, second and fifth offers, or either of them, had been proved and established to the satisfaction of the jury, all grounds for the imputation to the defendant of bad faith and fraud would have been removed; and as full value appears to have been paid for the bonds, and no actual knowledge of or notice to it, of the theft was shown, or could be properly inferred, there would have been no right to a recovery by the plaintiff.

The proof was clearly proper for the consideration of the

jury, and its exclusion was erroneous. The order for a new trial was therefore properly granted, and it must be affirmed. Judgment absolute must also be rendered against the plaintiff under his stipulation, with costs.

REYNOLDS, C. (dissenting). That the plaintiff was the owner of the bonds on the 12th of September, 1865, and that on the evening of that day, they were stolen from his trunk is not disputed. It is equally true that printed notices of the theft, giving the numbers of the bonds, were left at the defendant's bank, between nine and ten o'clock the following morning. The defendant's bank opens for business at half past nine o'clock in the morning, and the cashier is generally there at nine, and he does not remember to have seen on the thirteenth of September the notices of the robbery left at the bank that morning, although he was there at nine o'clock. This may be accounted for from the fact that the defendant bought and sold bonds, without any regard to notices of theft left at the office. Between the thirteenth and eighteenth of September the bonds in question were purchased by the defendant, and on the eighteenth were sent to Washington for their conversion, and registered bonds for a like amount were issued to the defendant on the twenty-first of that month.

If there was any evidence tending to show *mala fides* on the part of the defendant in purchasing the bonds, all the cases agree that it presented a question of fact for the jury, and ordinarily their verdict would be conclusive. (*Goodman* v. *Simonds*, 20 Howard [U. S.], 343, *et. seq.*; *Goodman* v. *Harvey*, 4 Ad. & Ellis, 870.) The fact was not disputed, that as soon as the plaintiff discovered his loss he made prompt and vigorous efforts to give notice of the fact. The police of New York were notified the same evening of the robbery, and hand bills, describing by numbers and amounts the stolen bonds, and offering a reward for their recovery, were printed and ready for distribution on the following morning as early as six o'clock. These handbills were exten-

sively distributed, but for the present case it is sufficient to
say that two or three notices or handbills, before, or at least
as early as nine o'clock on the morning of the thirteenth of
September, were left at the defendant's bank—one on the
desk of the cashier, and another on a desk opposite. If there
is any conflict of evidence on this point, we must assume that
the jury, as they had the right to do, found that the fact was
as claimed by the plaintiff. We must, therefore, assume,
as a fact, that a notice of the robbery, and a description of the
stolen bonds, were given to the defendant, through its cashier
and one other of its officers, at least as early as nine o'clock on
the morning after the bonds were stolen. Nothing material
to the present question occurred until the plaintiff's banker
received from the Treasury Department at Washington, a
letter dated September 23d, 1865, advising him, that, on the
nineteenth of September, two of the stolen bonds were pre-
sented for conversion by the defendant for account of F.
George Adams, and registered bonds of a like amount were
issued to him on the twenty-first. On being shown this letter
the plaintiff at once called at the defendant's bank,—saw its
cashier, showed him the letter from the Treasury Depart-
ment, advised him of the theft, and demanded the bonds.
The cashier said, " you can't have them." The plaintiff then
remarked, " I sent you a printed notice of the robbery the
next morning." The cashier replied that, " they did not care
for the notice. We don't care for notice." And the plaintiff
left without further satisfaction.

The facts as above stated are as favorable to the plaintiff
as a jury upon the evidence would be authorized to find.
When the plaintiff rested a motion in the form of a nonsuit,
was made upon the ground that, " the legal presumption is
that the person from whom the defendant received the bonds
was himself a *bona fide* holder and not the thief." This
motion was properly denied. Ordinarily it might be assumed
that the mere possession of negotiable commercial securities
carried with it the legal presumption that the actual possessor
was a *bona fide* holder and owner. In this case it was clear

that the bonds in question were stolen from the plaintiff, and there was at least some evidence tending to show that the defendant had notice of the theft.

A question was, therefore, made for the jury, and the verdict must be conclusive, unless something shall be discovered rendering a new trial necessary, for the reason that the jury had been erroneously instructed, or that evidence had been erroneously admitted.

The cashier of the defendant testified in substance that he told the plaintiff, that they could not pay any attention to notices of thefts, and that the defendant bought and sold bonds without any regard to these notices left at the office. No record was kept of them, and no instructions were given to the clerks that such notices should be called to the attention of the cashier.

The defendant then offered to prove:

1. That these government securities were payable to bearer. That the amount in circulation was so great, and the amount stolen and lost is so great, and the notices of such thefts and losses so frequent, that it is utterly impossible, without stopping their business, for defendants to take notice of, and keep track of, these lost and stolen bonds.

2. And, further, that the defendant dealt largely in government bonds similar to these, and that they are received and paid out as money by bankers and brokers generally. That very large amounts, amounting to several millions, have been stolen and advertised. That notices are being constantly thrown in their bank, of such thefts, with lists, numbers and descriptions, and that it would be impracticable to deal in government securities if they are bound to take notice of such notices.

3. The defendant further offered to prove that United States securities, like those in suit, pass from hand to hand by delivery, are received and paid out by banks, bankers and brokers as money, are bought and sold daily in the markets in parcels varying from $1,000 to $500,000, and that they are always paid for in cash on delivery.

4. As a separate proposition, the defendant, in connection with the last above proposition, offered to prove that printed notices of loss of such and other securities, by theft or otherwise, are daily, and frequently each day, thrown or brought into the offices of dealers in such securities, and that it is impracticable, in the ordinary course of business, to make a comparison between such notices and the securities purchased and delivered.

These offers of evidence were all rejected and the defendant excepted.

The learned judge at the trial submitted the case to the jury on a charge, to portions of which the defendant took the following exceptions:

1. To the part of the charge that " the theft having been proven, it devolves on the defendants to show that they purchased these bonds which are payable to bearer, and, therefore, pass by delivery, giving value for them."

2. To that portion of the charge given as follows: " He (the plaintiff) claims that immediately upon discovering his loss, and on the same evening that it occurred, he notified the police and caused circulars to be printed, one of which has been produced before you, advising the public of the misfortune, and cautioning them against purchasing the stolen securities, and he insists that the evidence shows that early on the next morning, and before the usual hour of business, some of these circulars had been delivered at the defendant's place of business, by means of which they either had, or with reasonable care and attention might have had notice of the loss, and if he be correct, then he will be entitled to your verdict."

3. To the following: " Did the notice ever reach the defendant? If it did, and they chose to disregard it, then they are not purchasers in good faith, because, if they purchased after notice, or willfully shutting their eyes against notice, the law considers the purchase to be made in bad faith. In other words, a purchase after notice implies bad faith."

4. To that part as follows, "If, however, you conclude that the circular was delivered, and that it came to the notice of the defendants, or might have done so but for their own act, and that notwithstanding that the defendants saw fit to buy these bonds, then they are not owners of them in good faith and your verdict must be for the plaintiff, because the law does not permit parties to buy and retain stolen property, upon the plea that to take notice that it has been stolen would so interrupt their business as to render it impracticable to conduct it."

We have thus presented for decision questions of some interest and importance, if not of difficulty.

It has already been suggested that there was evidence sufficient to sustain the verdict of the jury. No one doubts but that, if the defendant had actual notice that the bonds it purchased had been stolen from the plaintiff, he should recover. It is precisely the same thing if the evidence authorized the jury to say that they were not purchased in good faith. Upon this question there is really no dispute of fact. Notices of the theft were left at the defendant's bank, before banking hours, on the morning after the robbery. This is not controverted, but the defendant says that it pays no attention to such notices, and buys bonds regardless of them. And the cashier does not remember to have seen the one in question. Upon this evidence, I think the jury had the right to find the same verdict they would have been authorized to find if the defendant had put a sign in front of its office to the effect that "Stolen bonds are here bought and sold upon liberal terms, without any regard to notice of the fact that they have been stolen." If the defendant did not hang out such a sign, it certainly acted upon the idea that such a sign might suggest to the army of robbers who have stolen bonds for sale. Such a principle, I think, will not be generally approved, and the finding of the jury should not have been disturbed. A case may be supposed where an offer of proof, apparently admissible, may be ruled out.

If, in an action upon two promissory notes, one for $300

and the other for $200, the plaintiff had proved the signature of the maker, and the defendant should offer to show that the addition of the amount of the one note to the other did not make $500, I think a court might properly reject the offer as entirely without sense or reason, for some things may be assumed as matters of common knowledge. When, therefore, the defendant proposed to prove, in this case, that it was impracticable to conduct business if compelled to pay attention to notices of stolen bonds, the proposition was simply absurd, for persons of the commonest knowledge of the business of banking would say, without hesitation, that the employment of a single additional clerk, at a moderate salary, would enable the bank to keep an accurate account of all notices of stolen bonds left at the bank, either in or out of the hours of actual business. With an extensive and, it may be assumed, a profitable business, the employment of an additional clerk could not be regarded as fatal to the success of the defendant or scarcely an impediment to its prosperity, and yet of the last importance to those who are so unfortunate as to have whole fortunes carried away in the night by burglars and thieves.

I think we are to view the offers of the defendant, to prove the facts proposed, in the light of common sense at least, and if so, they were unfit to be proposed, and were for that reason, if for no other, properly rejected.

Even if the rule in *Goodman* v. *Harvey* (4 Adol. & Ell., 870) be followed, it is not apparent that the result of this case should be for the defendant. That was an action by the indorsee of a bill who had given value, and the title was disputed upon the ground that his indorser had obtained the discount of the bill in fraud of the right owner. Lord DENMAN submitted the question to the jury whether the indorsee acted with good faith in taking the bill. The jury found, substantially, that he had not, and a nonsuit was taken. Upon a rule *nisi* Lord DENMAN said, " The question I offered to submit to the jury was, whether the plaintiff had been guilty of gross negligence or not. I believe we all are of opinion that gross negligence

only would not be a sufficient answer where a party has given consideration for the bill; gross negligence may be evidence of *mala fides* but is not the same thing." However shadowy the distinction between gross negligence and *mala fides* may appear to, be, it is obvious that the question of *bona or mala fides* was for the jury. That case, however, is unlike this. There, the question of bad faith was founded upon some uncertain marks of a notary upon the face of the bill, relating to its non-acceptance. Here the question is whether the defendant had notice that the bonds were stolen, and the jury found for the plaintiff upon at least some evidence of the fact.

For some reasons, before stated, I do not think that the offers of evidence by the defendant, rejected on the trial, materially affect the question. Without going into further detail, the substance of the whole is, that the defendant offered to prove that it was doing an extensive business in government bonds, and that its business was so large, and thefts so frequent, and notices so numerous that it was impracticable to pay any attention to them without stopping business. This fact, very obviously, could not have been proved, for the proposition is against the common sense of mankind. But the very proposition, if approved, involves a decision that any party may so extensively engage in the business of buying and selling negotiable bonds of the United States, for individual profit, that no attention can be paid to notices that certain of such securities have been feloniously taken from the rightful owner, and that the thief is about to negotiate them for value. If any such state of things exists, the defendant ought to curtail its business, or employ a greater clerical force. I do not agree that there is any condition of things in which a bank or broker, dealing in negotiable securities, may, for convenience or any other reason, peremptorily disregard notices of robbery, and then claim the protection due to a purchaser in good faith of bonds which have been stolen. I do not, therefore, think that the evidence offered would or should have aided a defendant who

proclaims as a rule of its action that it will give no heed to notices such as were given in this case.

Nor do I find any substantial objection to the charge of the judge to the jury. It was obviously a case for the jury, and they were instructed to find whether or not the notice of the theft reached the defendant, and if it did, and was willfully disregarded, then the defendant was not a purchaser in good faith, and that a purchase after notice implies bad faith. In this there was no error. Besides, I think the second and third exceptions are not well taken in point of form. Each embraces some observations of the judge which are entirely unobjectionable, and the exception must fail, even if there be in the part objected to something that was not entirely correct. The rule is too well settled to need the citation of any authority for its support, that the party excepting must lay his fingers upon the obnoxious instruction alone. He cannot couple the good with the bad in a single exception without failing altogether.

The cases relied on to sustain the decision of the General Term in granting a new trial do not, I think, control this case, even if the rule supposed to be laid down in those cases be admitted to the fullest extent. It appears to have been considered that the case of *Murray* v. *Lardner* (2 Wallace [U. S. R.], 110) was decisive. In that case the bonds were stolen at Philadelphia on the night of Wednesday the 23d of February, 1859, and the theft was not discovered until the following Saturday, the 26th; and no notice of the robbery appeared in any newspaper or otherwise, in Philadelphia or New York, until the following Monday, the 28th. In the meantime, on the 24th, the day after the robbery, the bonds were sold to Murray, in New York, for full value, without notice of the robbery and without suspicion or any reason to suspect that there was any infirmity in his vendor's title. This case, therefore, proves absolutely nothing for the defendant. The case of *Murray* v. *Lardner* only affirmed the supposed principle of the decision in *Goodman* v. *Simonds* (20 How. [U. S. R.], 343 *et. seq.*), where Mr. Justice CLIF-

FORD entered into a very elaborate consideration of all the authorities relating to the subject, English and American. That was not a case of stolen bonds, or of anything very nearly kindred to the one at bar. In that case, a negotiable bill of exchange had been transferred, before maturity, without notice of any defect in the title of the party making the transfer; and the Supreme Court of the United States reaffirmed, after most elaborate discussion at the bar and by the bench, the elementary principle, that "a *bona fide* holder of a negotiable instrument for a valuable consideration, without notice of the facts which impeach its validity between the antecedent parties, if he takes it under an indorsement made before the same becomes due, holds the title unaffected by these facts, and may recover thereon, although, as between the antecedent parties, the transaction may be without any legal validity." The instructions condemned in that case were, that if such facts and circumstances were known to the plaintiff that caused him to suspect, or that would have caused one of ordinary prudence to suspect, that the drawer had no interest in the bill and no authority to use the same for his own benefit, and by ordinary diligence he could have ascertained the facts, "then the jury should find for the defendant." In the argument and decision of this case, the whole doctrine of the law relating to the transfer of commercial paper before or after due and with or without notice, was fully and ably discussed; but it does not appear to have any precise relation to this case, now to be decided.

The case of *Welch* v. *Sage* (47 N. Y., 143), is also supposed to control this case, but the report of the case does not enable us exactly to see how far the point in judgment there affects the question before us. The action was trover, to recover the value of three $1,000 coupon bonds of the Milwaukie & St. Paul Railroad Company, payable to bearer. The bonds were delivered by the plaintiff to one Thomas, a broker, to take to the defendant, who was an officer of the railroad company, and to sell them to him. The defendant received the bonds, and refused to give them back, alleging they were

stolen bonds. They were demanded by the plaintiff, and the defendant refused to give them up. He made no claim himself to the bonds, but said they belonged to one Ralph. This was in July, 1868. Sage, the defendant, immediately notified Ralph, and he, on the next day, replevied the bonds from Sage, and on the 20th of October, 1868, the plaintiff was made a defendant in that suit. On the 12th of October, 1868, Welch commenced his action of trover against Sage, and the action of replevin was never tried. In respect to the title of the plaintiff, it appears that he obtained the bonds from a firm of bankers in New York, with a California bond, for which he advanced $3,500 in cash. It does not appear that he had the slightest notice or suspicion at the time, of any infirmity in the title of the bankers from whom he received them. The plaintiff in that case recovered at the circuit, as he clearly was entitled to, and an order granting a new trial was promptly reversed by the Court of Appeals.

In the case at bar, it is now reduced substantially to a single proposition. May the defendant deal in stolen bonds, with knowledge of the theft, without any regard to information on the subject or the rights of the injured party, upon the ground that, in pursuit of its own gains and profits, it is inconvenient or more expensive to respect the rights of others after due notice or the means of knowledge? I think not. Every individual or corporation must conduct business of any kind, be it large or small, with some regard to the rights of others. If I am robbed of my property, and give due notice, any individual or corporation having notice, must deal in the stolen property at their peril. It is no answer to say that it is inconvenient or expensive. The very conditions of society, and all the maxims of the law, require that every individual in a community must yield something of his supposed natural rights to his neighbor, so that the very ligaments which bind human society together may continue unbroken.

The jury have found that the defendant purchased the bonds in question after knowledge of the theft, or after having willfully neglected or refused to pay any attention to

notice given.   It may also be assumed that the defendant claimed to deal in stolen bonds with impunity, after full knowledge or adequate means of knowing the fact.   It is not intended to deny the proposition that a party dealing in negotiable securities of any kind is not responsible for any defect of title in his vendor, unless he purchases with notice or means of knowledge of the defect, or has been guilty of some such conduct as that a jury would say that he was not a purchaser in good faith.   The exact line between good faith, gross negligence and bad faith, must always be fixed by a jury in every case, as it arises.   A purchase, after actual notice, all agree, would be made in bad faith, and, I think, the jury in this case rightfully found that it was one of that character.

The order of the General Term of the Common Pleas of New York should be reversed, and the judgment on the verdict affirmed, with costs.

For affirmance, LOTT, Ch. C., EARL and JOHNSON, CC.

For reversal, REYNOLDS and GRAY, CC.

Judgment affirmed.