## WHITE-PHILLIPS CO., Inc., v. GRAHAM.
### No. 5156.

Circuit Court of Appeals, Seventh Circuit.
Dec. 8, 1934.

Rehearing Denied Jan. 28, 1935.

William L. Patton, of Springfield, and Harold A. Smith and Winston, Strawn & Shaw, all of Chicago, Ill., for appellant.

W. Edgar Sampson, of Springfield, Ill., and James J. Barbour, of Chicago, Ill., for appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

EVANS, Circuit Judge.

By appropriate action the Treasurer of Illinois sought to determine the legal ownership of eight $1,000 Illinois Highway bonds which had been stolen from appellee and which subsequently, through purchase, came into the possession of appellant.

*The Facts.* Appellee placed the eight Illinois Highway bonds in a safe in his home. Burglars stole them on or about September 2, 1930. He immediately gave notice of the theft to the Foreman State Corporation and to others. Pursuant to its custom the Foreman company mailed a report of this theft to a list of municipal bond dealers on or about September 5. The Chicago branch of the appellant company was on Foreman's mailing list.

Appellant is a dealer in municipal bonds with its principal office in Davenport, Iowa, and a branch office in Chicago. About half of its business is transacted in each office, but the staff in Davenport is four times as large as that employed in Chicago, hence the description of the Davenport branch as the principal office.

The bonds in question were acquired by appellant from J. A. Connolly of St. Paul who, on September 13, 1930, wrote to the Chicago branch asking for bids on eight Illinois Highway bonds and giving the maturity dates. On the 16th appellant's Chicago office wired a bid which was promptly accepted. Directions were given to ship the bonds to Davenport, but, accompanied by a sight draft payable to a Chicago bank, they were sent by Connolly to Chicago on September 22, and payment was promptly made. The bonds were then sent to the Davenport office and received by it on September 23, and were there used as collateral to secure a loan.

The case turns upon the matter of appellant's knowledge. It appears that when the bonds arrived in the Davenport office and were lying upon the desk of a clerk, that employee went to a pencil sharpener near by, and while he was sharpening a pencil his eye chanced to fall upon the notice of a list of stolen bonds which hung upon a nearby wall hook. Observing that Illinois Highway bonds appeared thereon he recalled that such described bonds were on his desk. Upon examining the numbers of these bonds he discovered that they had been stolen. He notified the Chicago office which in turn tried to recover the purchase price from Connolly. Connolly was sent to jail where he died. No money was recovered, and the legal ownership of the bonds remained unsolved.

The evidence is unsatisfactory in so far as it relates to appellant's method of handling the notices of theft. There was evidence that both the Chicago and Davenport branches had in the past received notices of stolen bonds. It was the practice in the Chicago branch to place them in a drawer. The Davenport branch placed them upon a hook There were no directions to the employees as to the handling of them, and no settled policy was pursued in bringing such notices to the attention of the office; nor were tab-

ulations or records kept of such lists; nor were they examined before bonds were purchased. No employee was instructed to note, record or circulate the contents of the lists.

In Davenport, the office boys in charge of the mail put the lists on the hook "because they didn't know of anywhere else to put them," and they also put other papers on the same hook. There is no affirmative evidence that the particular notice was received by the Chicago branch, although other notices of similar import had been received and the Chicago office was on Foreman's mailing list. Employees of the Chicago branch testified that they searched the Chicago office and found no such notice.

In consummating the sale of the bonds appellant never inquired as to the serial numbers of the bonds. Testimony showed that appellant, not knowing Connolly, looked him up in a Security Dealers Registry, found him listed, and proceeded to deal with him.

The District Court made findings in appellee's favor. As a conclusion of law, it found:

"That the respondent, by reason of having actually received, prior to its purchase of the securities here involved, a notice that the same had been stolen as hereinabove set forth, did not, by the purchase of said bonds, become a holder thereof in due course, but that at such time the said respondent had knowledge of such facts that its action in taking such securities amounted to bad faith."

The following provisions of the Illinois Negotiable Instruments Act are applicable:

"Holder in Due Course Defined. Sec. 52. A holder in due course is a holder who has taken the instrument under the following conditions:

"1. That the instrument is complete and regular upon its face.

"2. That he became the holder of it before it was overdue, and without notice that it has been previously dishonored, if such was the fact.

"3. That he took it in good faith and for value.

"4. That at the time it was negotiated to him he had no *notice* of any infirmity in the instrument or defect in the title of the person negotiating it." Smith-Hurd Ann. St. Ill. c. 98, § 72, Cahill's Rev. St. Ill. c. 98, par. 72.

"Notice of Infirmity—What Constitutes. Sec. 56. To constitute *notice* of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had *actual knowledge* of the infirmity or defect, or *knowledge* of such facts that his action in taking the instrument amounted to *bad faith*." Smith-Hurd Ann. St. Ill. c. 98, § 76, Cahill's Rev. St. Ill. c. 98, par. 76.

The narrow question is: Did appellant have *"actual knowledge* of the infirmity or defect, or *knowledge of such facts* that his (its) action in taking the instrument amounted to *bad faith"*?

Appellant supports its argument that it, as a purchaser of negotiable instruments in good faith, before maturity and for valuable consideration, should be protected against a charge of bad faith, which has no fact support other than the general circulation of notices among dealers to the effect that a few of a large issue of bonds had been stolen, by citation of opinions, both English and American. Vermilye & Co. v. Adams Exp. Co., 21 Wall. 138, 22 L. Ed. 609; Raphael v. Bank of England, 17 C. B. 161, 139 Eng. Repr. 1030; Seybel v. Nat. Curr. Bank, 54 N. Y. 288, 13 Am. Rep. 583; Hency v. Sutro & Co., 28 Cal. App. 698, 153 P. 972; Merchants' Nat Bank v. Detroit Trust Co., 258 Mich. 526, 242 N. W. 739, 85 A. L. R. 350. See also Kean v. National City Bank, 294 F. 214 (C. C. A. 6).

Appellee leans rather heavily on the recent decision of an Illinois court (Northwestern Nat. Bank v. Madison & Kedzie State Bank, 242 Ill. App. 22) (the substance of which decision appears later in this opinion) which, although not binding upon us, is entitled to dominant if not controlling influence, so it is urged, because of the standing of the court and the persuasive argument which supports the court's conclusion. He also contends that the facts above related would have led to a similar conclusion in any of the courts to whose decisions appellant so confidently points. Morris v. Muir, 111 Misc. 739, 181 N. Y. S. 913; Arnd v. Aylesworth, 145 Iowa, 185, 123 N. W. 1000, 29 L. R. A. (N. S.) 638; Ward v. City Trust Co., 117 App. Div. 130, 102 N. Y. S. 50.

■ It is clear, we think, since the decision of Burns Mortgage Co v. Fried, 292 U. S. 487, 54 S. Ct. 813, 78 L. Ed. 1380, 92 A. L. R. 1193, that the holdings of the Illinois Supreme Court, if any exist, construing this Negotiable Instruments Act must govern our decision. Whatever we may think of the advisability and the desirability of a construction of the Uniform Negotiable Instru-

ments Act, which would be similar throughout the United States (possible only through a decision of the United States Supreme Court uncontrolled by the decisions of the various state courts), we accept this decision unhesitatingly as announcing a rule which we must apply when we construe sections of the state statute defining the rights of a purchaser of negotiable instruments. This is true even though the statute is a uniform act that has been adopted in more than a score of states.

It is, however, only the decisions of the highest courts of the states that are binding upon us. Hudson v. Maryland Casualty Co., 22 F.(2d) 791 (C. C. A. 8).

The fact that the defeated party sought to review the decision in the Northwestern Nat. Bank Case, supra, and the Supreme Court of Illinois denied its application for a certiorari makes that decision no more authoritative. People v. Grant, 283 Ill. 391, 397, 119 N. E. 344; Minneapolis, St. P. & S. S. M. Ry. Co. v. Rock, 279 U. S. 410, 49 S. Ct. 363, 73 L. Ed. 766; United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361. The rule announced in said Northwestern Nat. Bank Case, supra, has not been approved, or passed upon, by the Illinois Supreme Court.

It becomes our duty, therefore, to examine the question in the light of all of the decisions of state and Federal courts and follow the United States Supreme Court decisions, if there are any in point; otherwise to announce that decision which in our opinion is in accord with the weight of reason and authority.

It is hardly necessary to quote at length from the leading English cases or from Vermilye & Co. v. Adams Exp. Co., supra. Only the pertinent excerpts are here set forth. In London Joint Stock Bank v. Simmons, App. Cas. 219 (1892), Lord Field said:

"In one of those cases, Raphael v. Bank of England, the plaintiff had, at some earlier period, received actual notice that the bank note in question had been stolen, but it was established to the satisfaction of the jury that the notice had been forgotten and was not present to his mind at the time of taking, and he was held entitled to recover."

In Venables v. Baring Bros. & Co., [1892] 3 Ch. Div. 527, Lord Kekewich said:

" * * * it was held that the holder might sue upon it (negotiable instrument), notwithstanding that when he took it he had the means at his disposal which would have enabled him to detect the bad title of his transferor; but of which means he neglected to avail himself. Negligence was there held to be no defense whatever, and I apprehend that principle is really the guide to all the decisions."

In Vermilye & Co. v. Adams Expr. Co., supra, the court said:

"By the well-settled law of the case they [bankers] may purchase such paper before due without cumbering their minds or their offices with the memoranda of such notices."

In Goodman v. Simonds, 20 How. 343, at page 365, 15 L. Ed. 934, the court said:

" * * * If a bill of exchange endorsed in blank, so as to be transferable by delivery, be misappropriated by one to whom it was intrusted, or even if it be lost or stolen, and afterwards negotiated to one having no knowledge of these facts, for a valuable consideration, in the usual course of business, his title would be good * * *. The word notice, as used by this court on the occasion referred to, we think must be understood in the same sense as knowledge, and indeed that is one of its usual and appropriate significations. * * * He [the purchaser] is then to be affected, if at all, by what has occurred between other parties, and he may well claim an exemption from any consequences flowing from their acts, unless it be first shown that he had knowledge of such facts and circumstances at the time the transfer was made.

"Nothing less than proof of knowledge of such facts and circumstances can meet the exigencies of such a defence. * * *

"According to the rule laid down in Goodman v. Harvey [4 Ad. and Ell. 870], which indubitably is the settled law in all the English courts, proof that the plaintiff had been guilty of gross negligence in acquiring the bill, ought not to defeat his right to recover; and if not, it serves to exemplify the magnitude of the error assumed in the instruction, that any facts and circumstances which would excite the suspicion of a careful and prudent man were sufficient to destroy the title. It is clear that one or the other of these rules must be incorrect; both cannot be upheld. Gross negligence is defined to consist of the omission of that care which even inattentive and thoughtless men never fail to take of their own property; and if such neglect would not defeat the right to recover—and clearly it would not, unless attended by bad faith—it cannot re-

quire any further reasoning to demonstrate that the instruction was erroneous."

In Hotchkiss v. Nat. Bank, 21 Wall. 354, 359, 22 L. Ed. 645, the court said:

"The law is well settled that a party who takes negotiable paper before due for a valuable consideration, without knowledge of any defect of title, in good faith, can hold it against all the world. A suspicion that there is a defect of title in the holder, or a knowledge of circumstances that might excite such suspicion in the mind of a cautious person, or even gross negligence at the time, will not defeat the title of the purchaser. That result can be produced only by bad faith, which implies guilty knowledge or willful ignorance, and the burden of proof lies on the assailant of the title. It was so expressly held by this court in Murray v. Lardner, 2 Wall. 110 [17 L. Ed. 857]."

More nearly parallel to the case at bar is the language of the court in Merchants' Nat. Bank v. Detroit Trust Co., 258 Mich. 526, 242 N. W. 739, 742, 85 A. L. R. 350.

" * * * We have no reason to doubt their testimony that they did not see or receive the notice. But, assuming that it was received, that they saw it and forgot about it or carelessly mislaid it so that it was not in their minds at the time they acquired the bonds, or assuming that it was received but through the carelessness of the mailing clerk it was not brought to the attention of the officers, how would these facts affect the company's title as holder in due course?"

The court repudiated the decision upon which appellee so strongly relies, Northwestern Nat. Bank v. Madison & Kedzie State Bank, 242 Ill. App. 22.

Speaking of this decision, it says:

"As far as we have been able to determine, this case stands alone. It estops the purchaser from showing good faith at the time the bonds are acquired. It makes notice of theft conclusive evidence of mala fides. It overlooks the well-established rule that, though one has received actual notice, if by forgetfulness or negligence he does not have it in mind when he acquires the bonds, he may still be a good-faith purchaser."

In fairness to appellee and to the Illinois Appellate Court, we think its opinion should be set forth in its own language. Northwestern Nat. Bank v. Madison & Kedzie State Bank, 242 Ill. App. 22.

"It becomes a question of law, therefore, whether or not his actual knowledge was that of the defendant corporation which must necessarily acquire knowledge, if at all, through its authorized agents. It is true that the several officers of the bank having to do with the negotiating of said loan denied any knowledge of the notice or of receiving it. But in our opinion the fact of actual notice depends on the authority of the agent to acquire it through opening and inspecting the bank's mail and not on his duty to report it to other agents of the bank. If there was neglect in that respect on his part it did not change the fact that the notice was received by the agent of the bank authorized to receive, acknowledge and deal with it. If to constitute actual knowledge of the bank it would be necessary to bring such notice to the personal attention of each of its several agents likely to deal with such securities then it would open the door to an easy evasion of liability and put a premium on the negotiation of stolen securities. The notice having been received by the proper agent of the bank to receive, open and acknowledge its mail in the line of his duties, we think the bank is estopped from claiming that it did not have actual knowledge of the defect in the title to the bonds it subsequently received.

"Under modern methods of doing business whereby ready reference may be had to such information thus furnished it, we cannot regard the knowledge thus once obtained by the proper agent to receive it, as being any less actual and binding because at the time of the negotiation of the stolen securities it may have been overlooked or forgotten."

After a study of all the authorities we find ourselves unable to follow the rule announced in the Northwestern Nat. Bank Case as a test of what constitutes bad faith and we must adopt the rule which seems to us to be backed by the greater weight of authority and which is founded upon the commercial necessity of giving the greatest possible saleability to negotiable instruments.

There remains nothing but to apply the rule thus accepted to the facts in the instant case and thus ascertain whether appellant had actual knowledge of the defect of title of the bonds it purchased or to ascertain whether it had knowledge of such facts that its action in purchasing the bonds amounted to *bad faith*.

In determining this question, we assume that the notices which were sent out by the Foreman company were received both at Davenport and Chicago; that there was a

want of ordinary care upon the part of the Chicago branch in not making more elaborate provision for the dissemination of the knowledge which said notices gave; that in purchasing the bonds appellant paid full value therefor; and at the time it had no actual knowledge they were stolen; that it made no investigation to ascertain whether the said bonds were stolen other than to inquire as to the status of the party who offered them for sale; that the information which came from the receipt of such notice of the theft of eight Illinois Highway bonds had been forgotten.

The District Court, in disposing of the case, did not make findings of fact respecting the existence of good or bad faith. It did recite the facts wherefrom it made a conclusion of law, as above stated.

Convinced as we are that the question has not been settled by the Supreme Court of Illinois and that the decision of the Illinois Appellate Court, above referred to, is contrary to the overwhelming weight of authority including the decisions of the United States Supreme Court, we find this issue in appellant's favor.

The decree is reversed with directions to proceed further in accordance with the views here expressed.